## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SHEILA ALBERS, as Administrator
of the Estate of J.A., Deceased,

    Plaintiff,

v.               Case No. 18-2185-DDC-JPO

CLAYTON JENISON and THE CITY
OF OVERLAND PARK, KANSAS,

    Defendants.

_____

## MEMORANDUM AND ORDER

This matter comes before the court on defendants City of Overland Park and Clayton Jenison's Motion for Judgment on the Pleadings. Doc. 9. Plaintiff has filed a Response. Doc. 22. And defendants have filed a Reply. Doc. 29. For reasons explained below, the court grants part of the motion and denies the remainder. After identifying the governing facts, this order explains why.

## I. Materials the Court Will Consider for the Motion for Judgment on the Pleadings

This lawsuit arises from the shooting of "J.A.," a 17-year-old boy, by Overland Park Police Department ("O.P.P.D") Officer Clayton Jenison on the evening of January 20, 2018. Before identifying the facts that govern this Motion for Judgment on the Pleadings, the court first must determine what, if any, materials offered by both parties outside of the pleadings it will consider.

When defendants filed their Motion for Judgment on the Pleadings, they also submitted a computer disc containing (1) video from a responding officer's dash-mounted camera, which captures the shooting and includes portions of audio from dispatch, and (2) a full transcript of the

911 conversation between dispatchers and officers involved in the event ("Audio Transcript").

Doc. 10-1 at ¶¶ 3–4. Defendants' motion explicitly relies on this video and Audio Transcript.

Plaintiff does not object to the court considering the video. *See* Doc. 22 at 7 (". . . Plaintiff does not object to the Court considering the video, as it shows precisely what it shows and no more."). But, plaintiff makes three arguments about what other evidence the court should consider and how the court should proceed. First, plaintiff objects to including the Audio Transcript that defendants provided because plaintiff questions the accuracy of the supporting affidavit. *See id.* at 8. Second, plaintiff asserts that if the court considers the video and/or audio transcript, Fed. R. Civ. P. 12 directs the court to convert defendants' Motion for Judgment on the Pleadings into a motion for summary judgment. *Id.* at 8. Last, and alternatively, if the court considers the video and Audio Transcript without changing the motion to one for summary judgment, plaintiff asks the court to consider exhibits plaintiff attached to her Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings.[1] *Id.*

### A.    Governing Law

Generally, at the motion to dismiss[2] stage, if the parties present matters outside of the pleadings for consideration, "'the court must either exclude the material or treat the motion as one for summary judgment.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Alexander v. Oklahoma*, 382 F.3d 1206, 1214 (10th Cir. 2004)). But, the district court may "consider documents attached to or referenced in the

---

[1]    Plaintiff includes six exhibits: O.P.P.D. Standard Operating Procedure 2330: Response to Resistance, (Doc. 22-1); Personnel Action Report of Clayton Jenison, (Doc. 22-2); O.P.P.D. Standard Operating Procedure 1080: Department Firearms and Less Lethal Weapons Training, (Doc. 22-3); Investigatory Reconstruction Analysis Report by Steven R. Christoffersen, P.E., (Doc. 22-4); Affidavit of Steven R. Christoffersen, P.E., (Doc. 22-5); and Résumé of Steven R. Christoffersen, P.E., (Doc. 22-6).

[2]    Defendants have moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). Courts evaluate a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion to dismiss. *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

complaint if they are 'central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)); *see also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007); *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964–65 (10th Cir. 1994). Even when such documents exist, the court, at the motion to dismiss stage, "has broad discretion in determining whether to accept materials beyond the pleadings." *Brokers' Choice*, 861 F.3d at 1103 (citing *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998)).

## B.    Defendants' Submissions

The court first addresses the video exhibit submitted by defendants. The Complaint relies extensively on photos taken from the police dashcam footage and thus, one fairly could conclude that the Complaint incorporates the video by reference. *See* Doc. 4 at 9 (Compl. ¶ 22); *id.* at 13 (Compl. ¶ 29); *id.* at 16–21. And the video is central to plaintiff's claim—it captures the entire interaction between Officer Jenison and J.A. *See, e.g.*, *Estate of Ronquillo by and through Estate of Sanchez v. City and Cty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (considering surveillance video at motion to dismiss stage when it captured most of the events resulting in officers shooting suspect who attempted to flee in his car). Last, as noted, plaintiff does not challenge the video's authenticity. The court thus will consider the video.

But the court will not consider the Audio Transcript because plaintiff contests Officer Kohake's affidavit. This affidavit attests to the validity of the transcript purportedly capturing the exchange between the 911 dispatch and responding officers. *See* Doc. 22 at 7–8. Plaintiff

contends that Officer Kohake's affidavit "contains data that cannot be verified without a deposition." *See id.* at 8.

This issue is like one considered in *Stewart v. City of Prairie Village*, where our court declined to consider an audio recording that police offered in a 42 U.S.C § 1983 claim. 904 F. Supp. 2d 1143 (D. Kan. 2012). In *Stewart*, defendants sought to include an audio recording capturing the police's interaction with the decedent, who police shot three times, at the motion to dismiss stage. *Id.* at 1154, 1154 n.17. The disputed recording captured the officer's command, instructing the decedent, "don't pick up that knife." *Id.* at 1152. The court declined to consider the tape at the motion to dismiss stage, reasoning that "[a]lthough the recording is referred to in the Complaint, and although it addresses an issue central to Plaintiff's claim, Plaintiff argues that she cannot know if the tape is a true and accurate record of the event without discovery." *Id.* at 1153 n.17.

Here, plaintiff references some dispatch conversations in her Complaint. *See* Doc. 4 at 3 (Compl. ¶ 8); *id.* at 4 (Compl. ¶ 12). But, like the plaintiff in *Stewart*, plaintiff here argues that the affidavit, and in turn, the transcript require discovery to verify. *See* Doc. 22 at 8. The court thus will consider only the video—and the audio included in the video[3]. But the court will not consider the Audio Transcript.

C.     **Plaintiff's Submissions**

Finally, the court will not consider any exhibits attached to plaintiff's Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings. It is true, plaintiff refers to O.P.P.D. policies in her Complaint. *See* Doc. 4 at 23–24, 26 (Compl. ¶¶ 43–44, 64). But the

---

[3]      So far as the court can discern, the dispatch radio used in plaintiff's Complaint comes from what is audible on the dashcam video provided by defendants. *See* Doc. 22 at 34.

court will not consider the policies in full at the motion to dismiss stage because they are not central to either plaintiff's excessive force or municipal liability claims.

Exercising its discretion, the court finds that the Overland Park Police Department Standard Operating Procedures are not central to plaintiff's excessive force claim. It is true that "'[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violated some statutory or administrative provision.'" *Tanberg v. Sholtis*, 401 F.3d 1151, 1160 (10th Cir. 2005) (quoting *Davis v. Scherer*, 468 U.S. 183, 194 (1984)). But, in this Circuit, courts have considered an officer's training as part of an excessive force claim. *See Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) (incorporating officer's training into reasonableness evaluation under Fourth Amendment). So, while relevant, violating a standard operating procedure, standing alone, will not suffice. And, plaintiff already includes relevant standard operating policy excerpts in her Complaint. *See* Doc. 4 at 23–24, 26 (Compl. ¶¶ 43–44, 64). Thus, the court cannot say that the full policies are central to plaintiff's claim, and, in its discretion, the court chooses not to consider them at this early stage in the litigation.

Second, the standard operating procedures are not central to plaintiff's municipal liability claims. In her Complaint, plaintiff does not argue that the O.P.P.D.'s written policies are constitutionally impermissible. This argument would be a non-starter: plaintiff argues that Officer Jenison's conduct was, in part, constitutionally unreasonable because he violated his department's policies. *See, e.g.*, Doc. 4 at 26 (Compl. ¶ 64). Instead, based on the court's reading of plaintiff's Complaint, she asserts that the City failed to train or supervise officers to prevent them from violating citizens' constitutional rights. This is one avenue to establish municipal liability, but it does not require the court to consider the operating procedures at this stage.

Neither will the court consider the expert report materials and Officer Jenison's Personnel Action Report that plaintiff submitted with her Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings. *See* Doc. 22-2 (Personnel Action Report of Clayton Jenison); Doc. 22-4 (Investigatory Reconstruction Analysis Report by Steven R. Christoffersen, P.E.); Doc. 22-5 (Affidavit of Steven R. Christoffersen, P.E.); Doc. 22-6 (Résumé of Steven R. Christoffersen, P.E.). As noted, one prerequisite to considering exhibits outside the pleadings at the motion to dismiss stage is that the documents must be attached to or referenced in the complaint. *Smith*, 561 F.3d 1090 at 1098. Because these documents were prepared several months *after* plaintiff filed the Complaint, plaintiff, of course, never attached these exhibits to her Complaint or otherwise incorporated them by reference.

### D. Conclusion

In sum, the court will consider the video that defendants submitted with their motion. But, the court will not consider the Audio Transcript defendants provided; the standard operating procedures plaintiff submitted; or the expert witness materials plaintiff submitted. The court also declines to convert defendants' Rule 12(c) motion into a summary judgment motion. With these boundaries established, the court now turns to the facts that govern the case at this stage.

## II. Facts

The following facts are taken primarily from plaintiff's Complaint (Doc. 1), accepted as true, and viewed in the light most favorable to her. *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000) (explaining that, on a motion for judgment on the pleadings, the court must "accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff" (citation omitted)).

But when a complaint includes an attached exhibit, "[the exhibit's] legal effect is to be determined by its terms rather than by the allegations of the pleader." *Droppleman v. Horsley*, 372 F.2d 249, 250 (10th Cir. 1967) (quotations omitted); *see also Jacobsen*, 287 F.3d at 941 ("[I]n deciding a 12(b)(6) motion, the legal effect of the [attached documents] are determined by the [documents] themselves rather than by allegations in the complaint." (citing *Droppleman*)). So, although the court accepts all well-pleaded allegations as true and draws all reasonable inferences in plaintiff's favor, if there is a conflict between the Complaint's allegations and the content of the attached exhibit, the exhibit controls. *See Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972) ("[W]e need not accept as true . . . allegations of fact that are at variance with the express terms of an instrument attached to the complaint as an exhibit and made a part thereof"); *Olpin v. Ideal Nat'l Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir. 1969). Drawn from plaintiff's Complaint and defendants' video, the facts are as follows.

On January 20, 2018, J.A. was alone at the Albers' family home in Johnson County, Kansas, when defendants learned from a law enforcement dispatch that J.A. had threatened to harm himself with a knife. Plaintiff alleges dispatch directed officers, including Officer Jenison, to the Albers' house for the sole purpose of performing a welfare check on J.A.

Defendants received some information provided by dispatch en route to the Albers' home. A first-responding officer answered the radio dispatcher as they were in route, "I'm familiar with that kid." Before this incident on January 20, 2018, defendants knew J.A. potentially had mental health problems. But, before that evening, J.A. had never threatened suicide, attempted to commit suicide, or threatened to harm himself. From the time when the officers (including Officer Jenison) arrived at the Albers' home until after J.A. had been killed,

no responding officer had received Crisis Intervention Training (CIT).  CIT teaches officers how to deescalate and diffuse mental health situations when answering calls for service.

Two O.P.P.D. cars arrived simultaneously at the Albers' residence.  The first car, driven by Officer Newlon,[4] arrived and parked across the street, about 30 yards to the east of the Albers' home.  Officer Jenison arrived in a separate patrol car and parked around the corner on Hayes Street, about 40 to 50 yards northwest of the Albers' home.

Officers Jenison and Newlon then got out of their cars, approached the house, and spoke in front of the Albers' for a few minutes.  At no point did either officer knock on the Albers' door, attempt to communicate with J.A., or identify themselves as police officers.  Also, the officers' patrol vehicles did not have lights or sirens activated, and the cars remained out of the normal range of sight from the Albers' home.

Officer Newlon then returned to his patrol car to retrieve his cell phone.  At this point, Officer Jenison had taken a defensive stance behind a tree in the Albers' front yard, located 51 feet from the Albers' two-car garage.  While Officer Newlon headed toward his patrol car, Officer Jenison moved from behind the tree toward the Albers' home.  As Officer Jenison moved toward the home, the Albers' garage door began to rise.  Officer Jenison un-holstered his service weapon and continued toward the garage door.

Officer Jenison did not attempt to speak to J.A. then, nor did he identify himself as a law enforcement officer.  Instead, Officer Jenison watched and listened for nine seconds as the garage door rose.  During that time, Officer Jenison heard the minivan's engine running and saw that the rear brake lights were on.  Then, the white reverse-warning tail lights also lit up,

---

[4]    Plaintiff's Complaint refers to Officer Newlon as an "unidentified officer."  Doc. 4 at 4–5 (Compl. ¶¶ 13–16).  The court refers to him by name because the dashcam video comes from Officer Newlon's patrol car.

8

indicating that the minivan's driver had put it into reverse gear.  The minivan then began to back out of the garage slowly.  Officer Jenison was not standing in the path of the minivan.

J.A. was driving the minivan, and he began to back it out of the garage in a straight line at 2.5 miles per hour.  Officer Jenison moved from his existing location toward the outer rear passenger corner of the moving minivan with his weapon drawn and aimed at the car.  Officer Jenison then yelled "stop, stop, stop."  Plaintiff alleges J.A. did not know Officer Jenison was present in the driveway or that Officer Jenison was a law enforcement officer before he was shot.  Less than one second later, Officer Jenison fired his weapon two times at J.A.  Officer Jenison stood 5.9 feet away from the outer rear passenger corner of the minivan when he fired the first shot; he stood 6.3 feet away from the outer rear passenger corner when he fired the second.  Plaintiff contends that that one or both bullets struck J.A., incapacitating him and rendering him unable to control the minivan.

The minivan stopped briefly in the driveway but then appeared to speed up in reverse, making a U-turn in the open driveway/yard area of the Albers' property.  After the minivan completed the U-turn, Officer Jenison stood on the passenger side of the vehicle.  The minivan continued to travel in reverse at 3.5 miles per hour in a straight path directly toward the Albers' empty home.  Officer Jenison remained on the passenger side of the minivan and out of its path as it traveled past him and toward the home.  No other officers stood between the minivan and the Albers' residence as it traveled toward the Albers' home.

As the minivan traveled past Officer Jenison toward the home, he fired 11 more shots at J.A.  After the shooting stopped, the minivan coasted in neutral across the street, where it then stopped in a neighbor's front yard.

J.A.'s autopsy report shows that Officer Jenison shot J.A. six times with police-issued hollow point bullets: once in the back of the head; once in the upper neck; once in the left shoulder; once in the right back torso; once on the top right shoulder; and once in the lower lip.

## III. Legal Standard

Defendants have moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). Courts evaluate a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion to dismiss. *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

On a Rule 12(b)(6) motion to dismiss for failing to state a claim, the court accepts all facts pleaded by the non-moving party as true and draws any reasonable inferences in favor of the non-moving party. *Id.* "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Under this standard, 'the complaint must give the court reason to believe *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court has explained, simply "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In short, the court need not "accept as true a

legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 557 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (internal quotation omitted).

## IV.    Discussion

Plaintiff makes two claims, both under 42 U.S.C. § 1983.  First, plaintiff asserts that Officer Jenison used excessive lethal force in violation of the Fourth Amendment.  Doc. 4 at 25. Second, plaintiff asserts that the City incurs municipal liability for failing to train its officers how use appropriate force.  *Id.* at 29.

A defendant is liable under § 1983 if, under color of state law, he deprives a person of a constitutional right.  42 U.S.C. § 1983.  Defendants argue the court should dismiss plaintiff's § 1983 claims for two reasons.  First, defendants argue that Officer Jenison is entitled to qualified immunity.  Doc. 10 at 3.  Second, defendants argue that the Complaint does not plead a viable official capacity claim against either Officer Jenison or the City.  *Id.* at 17–18.  The court addresses each defense in turn below.

### A.    Qualified Immunity on the Excessive Use of Force

Qualified immunity protects officers from suit when the officer's conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known.  *City & Cty. of S.F. v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015).  "The plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right had been clearly established by the time of the violation."  *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015).  In this case, plaintiff alleges that Officer Jenison used excessive force against J.A. that violated the Fourth Amendment.  Doc. 4 at 25.  Defendants counter that qualified immunity shields Officer Jenison from this claim because (1) the use of

deadly force was not unreasonable, and (2) no law existed in 2018 suggesting that Officer

Jenison's conduct was plainly incompetent or in knowing violation of the law.  Doc. 10 at 9, 13.

### 1.  Constitutionally Excessive Force

A claim that law enforcement officers used excessive force to effect a seizure is governed

by the Fourth Amendment's "reasonableness" standard.[5]  *Cty. of L.A. v. Mendez*, __ U.S. __, 137

S. Ct. 1539, 1546 (2017).  "Determining whether the force used to effect a particular seizure is

'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality

of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake.'"  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting

*Tennessee v. Garner*, 471 U.S. 1, 6 (1985)) (further citation omitted).  The court must pay

"careful attention to the facts and circumstances of each particular case, including the severity of

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

That an officer made a mistake about the need for force does not decide the question

conclusively; rather, the court must analyze the situation as a reasonable officer would analyze it

in the heat of the moment.  *Id.* at 396–97.

A reasonable officer may use deadly force if, knowing the facts as the officer on the

scene knew them, the officer "had probable cause to believe that there was a *threat of serious

physical harm to [himself]* or to others."  *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d

---

[5]      Plaintiff also alleges defendants violated J.A.'s Fourteenth Amendment rights.  But for an excessive force claim "in the course of making an arrest, investigatory stop, or other 'seizure' of his person," a plaintiff only can claim a Fourth Amendment violation.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").  When an officer uses excessive force to kill an individual, a seizure has occurred.  *See Stewart*, 904 F. Supp. 2d at 1153.  Since plaintiff's claims arise from an officer's alleged use of excessive force, the Fourth Amendment alone governs these claims.

1255, 1260 (10th Cir. 2008) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir.

1995)) (internal quotations omitted). The answer to this question depends, in part, on the

following factors: "(1) whether the officers ordered the suspect to drop his weapon, and the

suspect's compliance with police commands; (2) whether any hostile motions were made with

the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4)

the manifest intentions of the suspect." *Tenorio*, 802 F.3d at 1163 (quoting *Estate of Larsen*, 511

F.3d at 1260). And, while these four factors "are quite significant," they are "only aids in

making the ultimate determination, which is 'whether, from the perspective of a reasonable

officer on the scene, the totality of the circumstances justifies the use of force.'" *Id.* at 1164

(quoting *Estate of Larsen*, 511 F.3d at 1260).

For example, in *Tenorio*, the Circuit affirmed a district court's decision denying summary

judgment based on qualified immunity. 802 F.3d at 1166. There, three officers had responded to

a 911 call where the caller reported that her sister-in-law's husband—Mr. Tenorio—was

intoxicated and holding a knife to his own throat. *Id.* at 1161. The caller worried that Mr.

Tenorio would harm himself or his wife. *Id.* at 1162. When the officers responded to the call,

dispatch had informed them about Mr. Tenorio, including that Mr. Tenorio had a knife to his

own throat; he had acted violently in the past; and that multiple people were at home with him.

*Id.* The Circuit concluded that the record could support a potential jury finding that would

establish Mr. Tenorio's excessive force claim:

> [I]n particular, that Tenorio "did not 'refuse' to drop the knife
> because he was not given sufficient time to comply" with [the
> officer's] order; that Tenorio made no hostile motions toward the
> officers but was merely "holding a small kitchen knife loosely by
> his thigh . . . and made no threatening gestures toward anyone."; that
> Tenorio was shot "before he was within striking distance of [the
> officer]; and that, for all [the officer] knew, Tenorio had threatened

only himself and was not acting or speaking hostilely at the time of
the shooting.["]

*Id.* at 1164–65 (citation omitted).

Similarly, in *Zia Trust Co. ex rel. Causey v. Montoya*, the Circuit affirmed a district
court's decision denying summary judgment on qualified immunity. 597 F.3d 1150, 1155 (10th
Cir. 2010). It concluded a reasonable jury could find from the summary judgment facts that the
officer, who was responding to a domestic dispute, had acted unreasonably because he shot a
man who was backing a van down a driveway, but the van appeared to be stuck on a pile of
rocks. *Id.* at 1153–55.

The Circuit applied the test as follows to *Zia Trust's* summary judgment facts, viewed in
plaintiff's favor: First, the officer did not order the suspect to drop his weapons; instead, the
officer got out of his vehicle with his weapon already drawn; proceeded to a position right in
front of the suspect's van; and did not say anything to plaintiff. *Id.* at 1154. Under the summary
judgment facts in *Zia Trust*, a reasonable jury could infer that the victim did not know the officer
was, in fact, a police officer. *Id.* at 1154–55. Second, the van appeared to be stuck on a pile of
rocks, and that it had lurched forward less than a foot, if at all, when the victim revved the
engine. *Id.* Third, the officer stood some 15 feet away from the van at the time of the shooting.
*Id.* Fourth, although the officer testified that he saw the victim change gears and could see "in
[the victim's] face what he intended," the Circuit concluded that based on distance, it was
unclear whether the victim intended to harm the officer or anyone else. *Id.* Considering the
factors together, the Circuit concluded that the summary judgment facts created a triable issue
whether the victim intended to harm the officer or others on the scene. *Id.* at 1155.

With this guidance from *Tenorio* and *Zia Trust*, the court now applies these cases to the
facts pleaded here. The first factor asks whether officers ordered J.A. "to drop his weapon[] and

[whether he complied] with police commands[.]" *Estate of Larsen*, 511 F.3d at 1260. The

Complaint alleges, and the video captures, that Officer Jenison yelled "stop, stop, stop" in quick

succession as the van began to roll down the driveway. Doc. 4 at 12. The van's brake lights

flashed intermittently during Officer Jenison's commands and stopped briefly after Officer

Jenison fired two shots at the van. Like the officer in *Zia Trust*, Officer Jenison approached the

vehicle with his weapon already drawn and positioned himself near the van. Plaintiff also

alleges, and the court must assume as true, that J.A. did not know someone was in the Albers'

driveway, or that the person was a police officer. A reasonable jury could also infer that, like

*Tenorio*, J.A. did not have time to comply with Officer Jenison's command because the first two

shots occurred just seconds after Officer Jenison's command to stop. This factor favors plaintiff,

suggesting that a constitutional violation occurred because Officer Jenison failed to identify

himself as a police officer and thus supports the inference that J.A. was unaware that a law

enforcement officer had ordered him to stop driving.

The second factor asks whether J.A. made "any hostile motions" toward the officers

"with the weapon." *Estate of Larsen*, 511 F.3d at 1260. This factor requires the court to

consider whether the minivan, in this case, could constitute a deadly weapon. It is well

established in our Circuit that "if threatened by weapon (which may include a vehicle attempting

to run over an officer), an officer may use deadly force." *Clark v. Bowcutt*, 675 F. App'x 799,

806 (10th Cir. 2017) (quoting *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010)). But

the Circuit in *Bowcutt* emphasized that the officer in that case and the officer in *Thomas* "[were]

in the [vehicle's] path in a very confined area." *Id.* at 808 (quoting *Thomas*, 607 F.3d at 655);

*see also Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017) (finding that

officer who fired at suspect in slow-moving car acted reasonably because officer was in "close

quarters" and suspect "had notice of police presence"); *id.* at 1211 ("[T]he video evidence here clearly shows Officer Thornton was positioned in the path of Mr. Carabajal's vehicle as it lurched forward.").

As the discussion of the first factor noted, the Complaint here alleges, and the video does not contradict, that J.A. was unaware of the police officer's presence until he was shot. Doc. 4 at 14. Also, plaintiff's Complaint pleads that Officer Jenison approached the garage, watched the garage door rise, saw the minivan reverse lights come on, and then began to move closer as the minivan backed down the driveway. *Id.* at 8–10. Officer Jenison moved toward the minivan, but he did not place himself in the van's path before he fired the first two shots. *Id.* at 12. Nor does the video show that Officer Jenison was confined in close quarters; to the contrary, defendants appear to concede that the video shows space between Officer Jenison and the minivan. Doc. 10 at 8 ("At this point, Jenison is, generally, to the rear and right of the van.").

The court thus holds that the second factor favors plaintiff. Taking the pleaded facts as true, a jury could find that a reasonable officer would not have concluded that J.A. was operating the minivan as a deadly weapon. Instead, when the first two shots were fired, the facts show that J.A. did not know the person yelling "stop" was a police officer; that Officer Jenison was not standing in a confined area or in the van's direct path; and that the van slowly backed out of the garage before the officer fired the first two shots.

The third factor turns on the distance separating Officer Jenison and J.A. The Tenth Circuit never has established a bright-line rule governing this aspect of the analysis. But in *Zia Trust*, the Circuit noted that it "could not say that a van fifteen feet away [from the officer], which according to the plaintiffs was clearly stuck on a pile of rocks, gave Officer Montoya probable cause to believe that there was a threat of serious physical harm to himself or others."

597 F.3d 1150, 1155 (2010). In this case, when Officer Jenison fired the first shot, plaintiff alleges that he stood 5.9 feet away; for the second shot, 6.3 feet away. This distance is significantly closer than the distance between the van and officer in *Zia Trust*. And, J.A.'s minivan was not immobilized by a pile of rocks or any other barrier. This factor thus favors defendants' argument that, based on the facts alleged, J.A. posed a threat of harm to Officer Jenison or others.

The fourth factor considers "the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. The facts alleged establish, for present purposes, that defendants knew J.A. had mental health problems before January 20, 2018, and that 911 callers had informed police that J.A. was threatening to harm himself with a knife. Also, dispatch communications to officers establish that one officer, while in route, said "I'm familiar with that kid." The court also must accept as true plaintiff's allegation that Officer Jenison did not see J.A.'s face in the car, that Officer Jenison did not speak with J.A. at any point during the interaction, and that J.A. did not know the person yelling "stop, stop, stop" was a police officer.

Defendants argue that J.A. intended to harm either Officer Jenison or the public if he could escape the garage and surrounding areas. A law enforcement officer's use of deadly force is not unreasonable if other officers or the public are threatened by a risk of harm from the vehicle. *Estate of Larsen*, 511 F.3d at 1260. Here, defendants argue, a reasonable officer in Officer Jenison's situation would be justified to use deadly force to prevent J.A. from driving away in the minivan because the responding officers knew J.A. was suicidal. Doc. 10 at 11. That is, defendants argue, J.A. would have driven off and intentionally caused a traffic accident to commit suicide. *Id.*

But, from the facts alleged, a reasonable jury also could find that J.A. only posed a harm to himself. Just like the officers in *Tenorio*, who knew at the time of the shooting that Tenorio only had threatened to harm himself and was not acting or speaking hostilely at the time of the shooting, 802 F.3d at 1165, Officer Jenison knew that J.A. had indicated that he just wanted to harm himself with a knife. Based on these facts, a reasonable jury could conclude that deadly force was unreasonable because J.A. only posed harm to himself because J.A. never had expressed a present intention to harm others, or indicate that he planned to commit suicide by a car accident.[6]

A reasonable jury also could find, based on the video, that no other officers stood in the van's path. The video shows that Officer Jenison, as J.A. backed out of the garage, remained to the right rear side of the van. No other officer is visible until after Officer Jenison had fired the first two shots. Defendants argue that Officer Jenison's proximity to a "wildly rotating van create[d] an objective threat to him." Doc. 10 at 11. But this argument fails to differentiate between Officer Jenison's first two shots and the last 11 shots. It also misapprehends the court's role at the motion to dismiss stage. At this stage, the court asks whether a reasonable jury could conclude that the *first two shots* were an unreasonable use of deadly force based on an inference,

---

[6]       Defendants direct the court to several cases supporting the proposition that it is not unreasonable for officers to shoot a fleeing suspect in a vehicle when the suspect presented a risk of harm to others. *See* Doc. 10 at 17 (citing *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992)). All of these cases involve a fleeing suspect, who the police had reason to believe had committed a crime and was actively avoiding capture. *See Brosseau*, 543 U.S. at 200 (referring to the officer's situation as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Cole*, 993 F.2d at 1333 (finding officer's use of deadly force reasonable to protect public and officer because officer suspected driver had committed a crime and had seen the driver "force several motorists off the road and threaten the safety of many others"); *Freland*, 954 F.2d at 347 (reasoning that because suspect "had proven he would do almost anything to avoid capture[] [the officer] could certainly assume he would not stop at threatening others"). The facts pleaded here are quite different: Police did not suspect that J.A. had committed a crime or was on his way to commit a crime. Also, J.A. slowly backed the minivan down the driveway without knowing police were present when Officer Jenison fired the first two shots. A reasonable jury thus could find that a reasonable officer in Officer Jenison's position would not assume that J.A. posed a threat to others based on the belief that J.A. was suicidal.

as the Complaint alleges, that the first two shots incapacitated J.A.  *See Cty. of L.A. v. Mendez*, ___ U.S. ___, 137 S. Ct. 1539, 1548 (2017) (explaining that "plaintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation.").  Thus, a reasonable jury could conclude that Officer Jenison violated J.A.'s Fourth Amendment rights and that Officer Jenison's initial conduct proximately caused the need to fire 11 more times at the minivan.  Because the court presumes plaintiff's pleaded facts as true, and the video is consistent with these allegations, this factor favors plaintiff's claim that Officer Jenison used unreasonable force.

Bearing in mind that these "four factors are only aids in making the ultimate determination," *Estate of Larsen*, 511 F.3d at 1260, the court concludes from the totality of the circumstances alleged that plaintiff has stated a claim that Officer Jenison used lethal force unreasonably.  The overarching reasonableness factors outlined in *Graham*—the severity of the crime; the immediate threat to the safety of officers and others, and whether the suspect is actively evading arrest by flight—further illustrate what a reasonable jury might conclude:  That J.A. had committed no crime; that no officer stood in the path of the minivan; that J.A. had not threatened to hurt anyone but himself; and that J.A. was not fleeing from arrest because he did not know that a law enforcement officer was standing behind the van.  The court must apply these inferences in plaintiff's favor at the motion to dismiss stage.  And so, the court thus finds that plaintiff has met her burden to plead facts capable of supporting a finding or inference of a constitutional violation.

### 2.  Clearly Established Right

For a statutory or constitutional right to achieve "clearly established" status, the existing precedent must make the right one that is beyond debate to a reasonable officer.  *Estate of*

*Larsen*, 511 F.3d at 1260. Also, the right at issue cannot be defined at a high level of generality; rather, the existing precedent must be "particularized to the facts of the case." *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted); *see also Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). This requirement means that the existing precedent either must involve materially similar facts or establish when the officer's conduct obviously violates the law. *White*, 137 S. Ct. at 552. Qualifying precedent usually comes from cases decided by the Supreme Court or the Tenth Circuit, but it also can come from clearly established case law in other circuits. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003). In short, "only the plainly incompetent or those who knowingly violate the law" cannot invoke qualified immunity. *Id.*

In *Mullenix*, for example, the Supreme Court rejected the Fifth Circuit's characterization of the constitutional right at issue. *Mullenix*, 136 S. Ct. at 309. The Fifth Circuit had characterized the right plaintiff asserted there as a right to be free from "deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 308–09 (internal quotations omitted). The Supreme Court instead construed the right claimed as the right to be free from deadly force when the officer "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer. . . ." *Id.* at 309. The Court held that no precedent clearly established this right. *Id.* at 309–10.

Plaintiff references several Circuit and Supreme Court decisions, but the most similar one is *Zia Trust*. In that case, a 2010 decision, the Tenth Circuit put officers on notice that the Constitution prohibits the use of deadly force where, under the facts alleged there, an officer shoots at a suspect in a van that was up to 15 feet away, stuck on a pile of rocks, and presenting no serious threat to officers or others. 597 F.3d 1150, 1154–55 (10th Cir. 2010). The *Zia Trust* court also quoted with approval that "'[w]e do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself.'" *Id.* at 1155 (quoting *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008)).

While not a one-to-one factual match, the distinctions between this case and *Zia Trust* only bolster a finding that the right plaintiff asserts here is a clearly established one. In *Zia Trust*, the officer had received a report that two guns were on the premises, *id.* at 1153; here, officers knew only that J.A. might have a knife at his residence, although there is no indication in plaintiff's Complaint or the video that J.A. had the knife with him in the minivan. And instead of positioning himself in front of the van, like the officer in *Zia Trust* did, *id.* at 1155, Officer Jenison stood behind and to the right of the van driven by J.A. Thus, the inferences most favorable to plaintiff are that J.A. did not know the person yelling "stop" was a police officer and that Officer Jenison did not stand in the van's direct path. Based on these inferences and this case's factual similarities to *Zia Trust*, the court holds that the Complaint states a plausible claim that Officer Jenison violated clearly established law when he used deadly force against J.A.

In sum, a reasonable jury could conclude that Officer Jenison lacked probable cause to believe that J.A. posed a threat of serious physical harm to Officer Jenison or others. The court reemphasizes that, at this stage, it must accept plaintiff's allegations as true and draw all

inferences in the light most favorable to plaintiff. On this basis, the court thus concludes, based largely on *Zia Trust*, that the law was clearly established that Officer Jenison had no right to use deadly force.

**B.      Official Capacity Suits**

Plaintiff also asserts official-capacity claims against both Officer Jenison and the City of Overland Park. The court takes these claims in turn below.

**1.   Officer Jenison**

Plaintiff's Complaint asserts claims against Officer Jenison in both his individual and official capacity. Doc. 4 at ¶ 2. Defendants argue that the court should dismiss the official-capacity claim against Officer Jenison because plaintiff also sued the City of Overland Park. Doc. 10 at 17; Doc. 29 at 9. The court agrees.

"The Supreme Court has recognized that '[t]here is no longer a need to bring official-capacity actions against local government officials [because] local government units can be sued directly for damages and injunctive or declaratory relief.'" *Moore v. Bd. of Cty. Comm'rs of Cty. of Leavenworth*, 470 F. Supp. 2d 1237, 1255 (D. Kan. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)); *Stewart v. City of Prairie Village*, 904 F. Supp. 2d 1143, 1161 (D. Kan. 2012). So, official-capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978). Here, plaintiff sued both Officer Jenison and the City under 42 U.S.C. § 1983. The O.P.P.D. employed Officer Jenison at the time of the shooting. Thus, Officer Jenison served as an agent of the City of Overland Park, and an official-capacity claim against Officer Jenison is redundant. *See Sims v. Unified Gov't of Wyandotte Cty./Kansas City,*

*Kan.*, 120 F. Supp. 2d 938, 944 (D. Kan. 2000).  The court thus dismisses plaintiff's official capacity claim against Officer Jenison.

## 2.  City of Overland Park

Plaintiff argues that the City of Overland Park had a policy or custom that directly caused one of the City's agents to deprive J.A. of his constitutional rights.  A municipality is liable under § 1983 only when its custom or policy directly causes a constitutional violation.  *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017).  A plaintiff may show that a municipality has established such a policy in the following ways:  (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010) (first quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); then quoting *City of Canton v. Harris*, 489 U.S. 378, 388–91 (1989)) (internal quotation marks omitted).

Plaintiff does not identify any formal policy statement, nor does plaintiff provide sufficient underlying facts to show that Officer Jenison is the "final policy making authority concerning police activities" beyond that conclusory statement.  *See* Doc. 4 at 2 (Compl. ¶ 2). Though plaintiff does not label her theory explicitly, the court concludes that the only possible basis for plaintiff's municipal liability claim under Count II is a failure to train theory.

### a. **Failure to Train**

Under Tenth Circuit precedent, a municipality is liable for failing to train its officers in the use of force only when (1) the officers exceeded the constitutional limits of force; (2) the excessive force occurred in a typical and recurring situation for police officers; (3) the city was deliberately indifferent about the need for training that would have prevented the excessive force; and (4) the lack of training directly caused the use of excessive force. *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

Plaintiff here has pleaded sufficient facts to satisfy the first element because, taking her facts as true, the Complaint has established that Officer Jenison used excessive force. Plaintiff also has alleged facts sufficient to meet the second element. *See* Doc. 4 at 29–31 (Compl. ¶¶ 72, 74) (alleging that by implementing seven unconstitutional department policies or practices the City "has been and continues to be deliberately indifferent to the rights of the citizens . . . with whom the police officers of Overland Park come in contact").

For the third requirement,

> [t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Carr*, 337 F.3d at 1229 (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998)) (internal quotation marks and citations omitted). And, "[e]ven where the City's 'policy is not

unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy.'" *Id.* (citing *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000)).

In this case, plaintiff seeks to establish a failure to train theory against the City based on the following: an alleged City practice of using excessive force, including deadly force, without regard for the need for such force; an alleged City practice of failing to act on or adequately punish an officer's use of excessive force; an alleged City practice of failing to train officers properly about how to approach slow-moving vehicles safely; and an alleged City practice of failing to train officers fully or properly about how to respond to a crisis intervention call for service.[7]

---

[7]    Defendants argue that plaintiff does not allege facts sufficient to show that the City caused the alleged deprivation of J.A.'s constitutional rights. Doc. 10 at 19. On one side, the Supreme Court in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), directs that a "'formulaic recitation of the elements'" without any factual allegation will not save plaintiff's Complaint from a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555)). But in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), the Supreme Court rejected a heightened pleading standard for § 1983 claims against municipalities, holding that "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 168 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The courts, in the post-*Twombly* and *Iqbal* world, often have grappled with the governing pleading standard for § 1983 municipal liability claims. The trend in our court is to permit plaintiffs alleging municipal liability to offer minimal factual allegations when plaintiff would not normally have access to internal policies or training procedures before discovery. *See Taylor v. RED Dev., LLC*, No. 11-2178-JWL, 2011 WL 3880881 (D. Kan. Aug. 31, 2011) (citing *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011)); *see also Brantley v. Dickens*, No. 16-CV-02124-JAR-KGS, 2016 WL 6138137, at *2 (D. Kan. Oct. 21, 2016) ("To reconcile *Leatherman* with *Twombly* and *Iqbal*, the Court follows the framework adopted by Judge Lungstrum in *Taylor v. RED Development, LLC*."). Such allegations must provide fair notice to the defendant and do more than merely recite the municipal liability elements:

> Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy. Those types of details, or any other minimal elaboration a plaintiff can provide, help to 'satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests,' and also to "permit the court to infer more than the mere possibility of misconduct."

And, plaintiff alleges the City's deliberate indifference to constitutional violations could have resulted from these alleged failures. Doc. 4 at 31 (Compl. ¶ 74). If proven, these facts would show that the City had actual or constructive notice that its failure to train or supervise its officers was likely to produce constitutional violations and that the City consciously chose to disregard those harms.

Last, the fourth element requires that "for liability to attach in a failure to train case, the identified deficiency in a city's training program must be closely related to the ultimate injury, so that it actually caused the constitutional violation." *Carr*, 337 F.3d at 1229 (citing *Brown*, 227 F.3d at 1290 (internal quotation marks and citations omitted)). Plaintiff does allege that the inadequate training and supervision directly caused the violations of J.A.'s rights. Doc. 4 at 31 (Compl. ¶ 74). And the harm to J.A. is the exact type of harm that one plausibly would expect the City's alleged failures to cause. Plaintiff has satisfied the fourth pleading requirement, alleging causation. The court thus concludes that plaintiff has pleaded adequate grounds for municipal liability under a failure to train theory.

## V.     Conclusion

For the reasons explained above, the court grants in part and denies in part defendants' Motion for Judgment on the Pleadings. The court grants defendants' motion and dismisses plaintiff's official capacity claim against Officer Jenison. Otherwise, the court denies defendants' motion.

---

*Thomas*, 800 F. Supp. 2d at 843–44 (first quoting *Twombly*, 550 U.S. at 555 n.3; then quoting *Iqbal*, 556 U.S. at 679). Defendants rely on *London v. Beaty*, 612 F. App'x 910 (10th Cir. 2015). There, the Tenth Circuit's unpublished decision affirmed a motion to dismiss plaintiff's municipal liability claim where plaintiff alleged "policymakers for the City of Tulsa, through willful blindness, caused a policy, practice, pattern and/or custom of allowing its police officers to deprive citizens of their constitutional rights." *Id.* at 914. *London* differs from the facts alleged here because plaintiff's pleading identifies the specific nature of inadequate training that caused J.A.'s alleged constitutional deprivation.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the defendants' Motion for

Judgment on the Pleadings (Doc. 9) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 26th day of October, 2018, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge